1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  **JORGE A. ALCANTAR,**

13                                    Petitioner,

14          **v.**

15

16  **F. FOULK,**

17                                    Respondent.

18

**Case No. 1:14-cv-00747 LJO MJS (HC)**

**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

19       Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas

20  corpus pursuant to 28 U.S.C. § 2254.  Respondent is represented by Ivan P. Marrs of

21  the office of the Attorney General.

22  **I.        PROCEDURAL BACKGROUND**

23       Petitioner is currently in the custody of the California Department of Corrections

24  pursuant to a judgment of the Superior Court of California, County of Fresno, following

25  his conviction by jury trial on September 29, 2011, for second degree murder, and

26  enhancements  including  personally  and  intentionally  discharging  a  firearm,  and

27  committing the murder for the benefit of a criminal street gang. (Clerk's Tr. at 710-13.)

28

1  Petitioner was sentenced to an indeterminate sentence of fifteen (15) years in state
2  prison for the murder conviction, twenty-five (25) years to life on the firearm
3  enhancement, and a consecutive ten (10) years on the gang enhancement. (Id.)

4      Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate
5  District, on May 31, 2012. (Lodged Doc. 1.) The court affirmed the judgment on October
6  1, 2013, but amended the sentence striking the ten (10) year gang enhancement
7  sentence and instead imposing a minimum term of fifteen (15) years before Petitioner
8  could be considered for parole.  (Lodged Doc. 4, at 24, People v. Alcantar, 2013 Cal.
9  App. Unpub. LEXIS 7097 (Oct. 1, 2013).) On December 20, 2013, the California
10 Supreme Court denied review. (Lodged Docs. 5-6.) Petitioner did not seek collateral
11 review of the petition in state court.

12     Petitioner filed the instant federal habeas petition on May 19, 2014.  (Pet., ECF
13 No. 1.) Petitioner presents two claims for relief in the instant petition.  Petitioner alleges
14 that there was insufficient evidence to support the gang enhancement, and that his due
15 process rights were violated by the denial of the trial court to bifurcate the gang
16 enhancement proceedings. (Id. at 4.)   Respondent filed an answer to the petition on
17 August 20, 2014. (ECF No. 15.) Petitioner filed a traverse on September 18, 2014. (ECF
18 No 17.) The matter stands ready for adjudication.

19

20 **II.    STATEMENT OF THE FACTS[1]** ([TRIAL EVIDENCE])

21      **A.    THE SHOOTING**

22     Summary

23          Abraham Leanos (Leanos) and Maciel were friends. Together, they
24     walked to a liquor store to buy beer. Maciel was wearing a red outer
       garment, a shirt displaying a large image of a bulldog, and a Fresno State
25     cap.[fn4]

26     **FN4:** A Fresno City Police Department detective was later asked to

---

27 [1]The Fifth District Court of Appeal's summary of the facts in its October 1, 2013 opinion is presumed
   correct.  28 U.S.C. § 2254(e)(1).

28

investigate Maciel's background and found no information that Maciel was a member of the Bulldog gang.

Defendant was in the liquor store with his girlfriend before Maciel and Leanos arrived. As a teenager, defendant had joined the Shelltown gang - an affiliate of the Sureno gang. The Surenos and Bulldogs are rival gangs. Whether defendant was still a member of the Shelltown gang at the time of the shooting was disputed at trial.

Defendant and his girlfriend were walking towards the exit of the liquor store as Maciel and Leanos entered. There was conflicting evidence as to what happened in the crucial seconds that followed.

However, it was undisputed that defendant raised his elbow at or near the time Maciel passed him near the store's exit (hereafter, the "elbow raise.") Defendant claimed he was merely placing a cigar in his mouth. The prosecution contended that defendant intended to bump Maciel as an inter-gang gesture of disrespect known as a "hit up." Eventually, defendant shot and killed Maciel outside the liquor store.

Leanos's Testimony

Leanos testified at trial. Surveillance video from the liquor store was admitted into evidence and shown to Leanos during direct examination. The prosecutor asked Leanos why the video depicts him looking over his left shoulder at one point. Leanos testified that he was speaking with Maciel at the time. At this point, the only interaction between Leanos and defendant was defendant's "mugging" (i.e., "[l]ooking at you in a mad face").

Leanos testified that it appeared on the video that defendant was holding what looked to be a cell phone. The prosecutor asked whether defendant was "mugging" in the direction of the cell phone or towards someone in particular. Leanos replied, "Well, he was looking in our direction. You know, I — maybe he was — I don't know, but he was looking in our direction when I seen [sic] him."

The surveillance video shows defendant raising his left elbow as Maciel and Leanos pass by. Leanos had not observed the "elbow raise" that night, and saw it for the first time on the surveillance footage. He never saw defendant come into physical contact with Maciel.

The video then shows defendant begin to look over his left shoulder. Maciel looked back at defendant. Defendant "started say[ing] something" "[w]hen he stepped out the door." When asked what defendant said, Leanos testified: "He was like, 'What's up, Homie. You want some? Come here. Come here. You want some?' He just kept trying to egg us on to go outside." Maciel was still looking at defendant as he spoke. Defendant continued to look at Maciel and Leanos while walking backwards. Maciel then started walking towards defendant. Leanos testified that defendant made a gesture with his hand "kind of telling us to 'come here.' " "At or near the time of this gesture, defendant said, "[C]ome here."[fn5] Neither Maciel nor Leanos had said anything to defendant at this point.

**FN5**: The trial court described a gesture Leanos made while offering this

3

testimony as "using his right hand, his hand up in front of him, as if telling us to 'come here' waiving his fingers, motioning back toward his body in a 'come here' motion."

Maciel and Leanos exited the store. Leanos walked out, hesitated, heard shots fired and ran back inside the store. He did so because he saw defendant "turning around - reaching." He told Maciel, "No. No. Don't go. Run." Leanos ran back inside the store. Maciel followed behind, but Leanos did not notice him initially. Maciel then fell to the floor and could not talk.

## Abrego's Testimony

Defendant's girlfriend at the time of the shooting was Maria Abrego (Abrego). Prior to arriving at the liquor store, she and defendant ate pizza at a nearby restaurant. Defendant consumed one pitcher of beer. Afterwards, they went to the liquor store.

The prosecutor showed Abrego the surveillance footage, and she identified herself and defendant on the video. The prosecutor asked if she recalled defendant raising his left elbow as depicted in the video, and she responded, "No. I didn't see it...."

Once she and defendant exited the liquor store, they began to walk back towards the nearby pizza restaurant. The video depicts defendant raising his right hand, then walking away. Abrego turned back and saw "those two men" (i.e., Maciel and Leanos) coming out of the liquor store. She then said, "'Oh, they're going to come looking for a fight or something.' " She turned again, such that she could no longer see Maciel and Leanos. That is when she heard shots, became frightened, and crouched down. Defendant began running down the street, and she followed.

They ended up at defendant's house, and spent the rest of the evening there. She told a detective afterwards that defendant had said to her, "Don't worry. Everything is going to be fine. That happens sometimes."

## Defendant's Testimony Regarding The Shooting[fn6]

**FN6**: Defendant's testimony from the prior trial was read into the record. What follows is a summation of defendant's testimony from both trials.

Defendant testified that he never said anything to "the victims" that night. Defendant testified that the "elbow raise" depicted in the video was him placing his cigar in his mouth. His girlfriend asked him what was going on and he replied, "Just ignore it. Just — nada. Don't listen" He then "kept on walking."

Defendant had testified that he did not bump Maciel intentionally, and he "didn't think" he had bumped Maciel at all. He never said anything to Maciel or Leanos and "wasn't even looking at them." Defendant had walked outside the store, and Maciel and Leanos came out afterwards. The "guy in the front" said, "What's up now, mother f[**]ker?" Defendant thought one or both of them were going to "beat" him "up." He told his girlfriend to hurry up, in Spanish. The "guy in front" ran after defendant,

4

with his left hand inside his pocket. Defendant believed the man had a knife or a gun. Defendant testified, "That is when I pulled out my gun and shot." He shot twice. He did not intend to kill, but he was scared and thought the man "was going to get" him.

## B.   POSTARREST

Search of Defendant's Apartment

Defendant was arrested the next night. The police searched his apartment. They located a holster and live ammunition under a refrigerator in the apartment. Defendant testified at the first trial that the gun he used to shoot Maciel went into the holster found under the refrigerator. One of the live rounds of ammunition had a "soft primer strike" on it. A police detective testified that soft primer strikes are caused when a round of ammunition is ejected from the chamber of a firearm without firing it.

Cell Phone Evidence

A cell phone was recovered from defendant's person when he was arrested. The cell phone had a number of text messages that were retrieved by law enforcement using computer software. The messages were transferred to a printout, which became an exhibit.

One incoming text message, dated March 20, 2011, at 10:45 a.m. read: "Sooo..whats going on? *Neon~Moon*" The next text message on the exhibit was a "sent message" (i.e., outgoing from defendant's phone), dated March 20, 11:31 a.m., which read: "I f[**]ked up"

Another incoming text message, dated March 20, 2011, at 12:13 p.m. read: "Ur always doing sum stupid when ur drunk..why don't u stop drinking n spend more time with ur kids..just sayin [¶] *Neon~Moon*" An outgoing text message dated March 20, 2011, at 1:04 p.m., read: "I know. This time it might b [sic] to [sic] late"

In an outgoing text message dated March 20, 2011, at 4:46 p.m., a text message read: "Nada. Cuida bien a mis bebes." A police detective, who is a native Spanish speaker, translated the message as follows: "It says, 'Nada,' which means 'nothing.' 'Cuida bien amis [sic] bebes,' which is 'Take good care of my kids' or 'babies.' "

Another outgoing text message dated March 20, 2011, at 9:07 was sent in Spanish. The police detective translated the message as, "'The police can find me with my phone on.... I'm going to turn it on from time to time.'"

Defendant's Phone Calls From Jail

A police detective testified that inmates of the county jail are given jail identification numbers referred to as a "JID." The detective was able to retrieve all calls made with defendant's JID and reviewed them. The parties stipulated to two translated transcripts of defendant's calls from jail on March 22, 2011, and August 3, 2011. Recordings of the two calls were played for the jury. The stipulated translation of the August 3, 2011, call between defendant and "ET" contains the following pertinent statements

by defendant:

"[Defendant]: Well what do you believe ... he told me, I talked to my lawyer and he told me to just tell the truth about what happened and well I didn't want to do nothing to them but [i]f they would have got me can you imagine what the both of them would have done to me. They would have f[**]kin' killed me right there.

"ET: Um.

"[Defendant]: I didn't do anything but defend myself ... no, no, no I didn't want to kill nobody. It was the last thing that ... that what more ... well I was left with no other.... [T]here was no other form. What else could I have done? If I would have run they would have caught me."

Later in the call, defendant said, "They would have put me nothing ... they would have f[**]kin' killed me between the both of them. And they say that I started all the shit I was on the damn phone. I didn't, I didn't even look at them or pay attention to them...."

"[Defendant]: I was walking, and I didn't even and he said that I hit him with my elbow. I put my damn cigar in my mouth and I didn't even ... and when they said something to me well I turned around because I said what do these f[**]kers want? And I turned around to see what the f[**]k they wanted. And they were ... I don't know what they were telling me but I just said "mmhha" all I did was do this with my hand like "mmhha" like [to say] go f[**]k yourself, right. I didn't pay attention to them. And that's when they came and well I went ... well there is the video. I got the f[**]k out of there ....

"ET: Yes.

"[Defendant]: I was going to go into the pizzeria, but, but when they were coming behind me I said I had no other choice ya. I wait another minute and they would have gotten me there."

## C.    GANG EVIDENCE

Photographs

Photographs were taken from defendant's cell phone and entered into evidence, including Exhibits 77 and 79. Both defendant and the gang experts testified regarding the photographs, as detailed below.

Officer Castro's Testimony

Classification of Defendant as a Gang Member

Rudy Castro, a San Diego police officer, testified that he investigated defendant and validated him as a member of the Shelltown 38 gang. Shelltown is considered a Sureno gang. Officer Castro testified that his criteria for validating defendant as a member of the Shelltown 38 gang were: self-identification, tattoos, and prior arrests for gang-related offenses in association with other gang members.

Officer Castro stated that in "July of 28,"[fn8] defendant was

contacted by a police officer and claimed Shelltown gang membership and a moniker of "Flacco." A field interview report indicates that in January 2007, defendant had "a 38 on his right ring finger." Officer Castro testified that defendant's tattoo reading "38" stood for "Shelltown 38 Street."

**FN8:** Presumably, a typographical error in the reporter's transcript.

Officer Castro also testified regarding defendant's association with known Shelltown gang members. Defendant had been contacted by law enforcement two or three times with a self-professed Shelltown gang member, Eduardo Murillo.

Officer Castro testified that defendant had been arrested for vandalism for spray painting "Shelltown 38" on a business in National City. He told the officer that he is an active member of Shelltown. Defendant last admitted gang membership in 2008.

<u>Shelltown Gang's Predicate Offenses</u>

Officer Castro testified regarding predicate offenses for the Shelltown gang.

In May 31, 2009, Shelltown gang member Cristobol Nare (Nare) was at a party, as was a Mr. Ochoa (Ochoa). Ochoa left the party and pulled into an intersection. Nare and two other individuals threw a brick through the window of Ochoa's vehicle. Nare and another individual went to the driver's side of Ochoa's vehicle and beat the victim. They displayed a handgun from the waistband, and stole a jacket and an iPod.

On December 22, 2009, three individuals were walking in the area of Shelltown. A couple "Hispanic males approached," and asked the individuals what they had in their pockets. One of the male suspects produced a knife and "wanted the property they had on them." As they were taking the property from the vicitim, the suspect "essentially" told them, "This is Shelltown." The suspect was arrested and identified as Joey Negrette, a Shelltown gang member.

In August 2010, Johnny Nava (Nava) and Orlando Aguilar (Aguilar) walked into a food store. Aguilar took some beer and attempted to leave without paying for it. A security guard confronted them at the door, and Nava said, " 'What are you going to do? This is Shelltown.' " Nava lifted up his shirt, showing a handgun to the security guard. They were arrested minutes later.

<u>Exhibit 77</u>

Officer Castro was shown Exhibit 77, a photograph depicting defendant and a female. He testified that defendant and the female were displaying gang hand signs in the photograph. He said that defendant was making a sign indicating the number "20." This was a gang-related symbol because the letters "S" and "T" are an abbreviation for "Shelltown" and "T" is the twentieth letter of the alphabet. Officer Castro did not know whether the Chargers played on the "file date" of the photograph, December 5, 2010.

Cross-Examination Regarding Defendant's Alleged "Move Out" from Shelltown Gang

The following colloquy occurred on cross-examination:

"[Defense counsel]: Do you know whether or not [defendant] was ever jumped out [of the gang]?

"[Officer Castro]: No.

"[Defense counsel]: Do you know how a person leaves a gang?

"[Officer Castro]: Either die or jump out or just move out; there are several different ways.

"[Defense counsel]: San Diego is how far from Fresno?

"[Officer Castro]: About eight hours.

"[Defense counsel]: Would you consider that a 'move out'?

"[Officer Castro]: Yes."

Detective Kyle Kramer's Testimony

Fresno City Police Detective Kyle Kramer (Kramer) testified as a gang expert for the prosecution. Detective Kramer validated defendant as a gang member. Detective Kramer located six jail classification questionnaires from 2000 to 2011, which indicate that defendant identified himself as a gang member. In five of the questionnaires, the identified gang was "San Diego Sureno." In the remaining questionnaire, the identified gang was simply, "Sureno."

Detective Kramer said that a tattoo of the words Shelltown and "what appears to be a shell," are indicative of gang membership. He continued to describe the remainder of defendant's tattoos as indicative of gang affiliation.

Exhibit 77

Detective Kramer was shown Exhibit 77. Detective Kramer described defendant's hand positioning as "putting up two fingers, and with the remaining thumb and the pinky and the ring finger ... forming ... a zero. The significance of that being signifying the number 20, being the letter T for Shelltown, and the female appears to be doing the same thing." Detective Kramer testified that the photograph's "file date" of December 5, 2010, was evidence of recent gang affiliation or identification.

Exhibit 79

Detective Kramer was shown Exhibit 79, a photograph. He described the photograph as depicting a headstone of one, Martin Castro, Jr. Based on his conversations with an Officer Castro, Detective Kramer testified that Martin Castro, Jr., was a Shelltown gang member at the time of his death. On the headstone appears the number "192," which references the 19th and 20th letters of the alphabet.

## Gang Colors

Detective Kramer was asked whether there are any colors of clothing associated with Surenos, other than blue. Detective Kramer responded that he has seen the use of "all black clothing" for the purposes of "trying to get away from the primary color of blue" and to "blend in with the environment" "especially at nighttime." He also said that someone could wear the color black because they did not want to associate with gangs any longer.[fn9]

**FN9:** Officer Castro testified that gang members do wear black, but he "wouldn't say because someone is wearing black they are gang members."

## Sureno Gang's Predicate Offenses

The prosecutor acknowledged that there had already been testimony at trial regarding the Shelltown gang's primary activities. Nonetheless, because "Shelltown is a subset of Surenos" the prosecutor asked for an example of Sureno criminal activity in Fresno County. Kramer testified that Sureno activities in Fresno County included "drive-by shootings, possession of controlled substances and firearms, assault with deadly weapons, murders, things of that nature." He then identified specific crimes committed by Sureno gang members, including an assault with a deadly weapon on August 24, 2008; possession of a firearm on July 20, 2006; attempted murder on March 31, 2009; and arson on November 18, 2008.

## Gang Culture Testimony

Kramer spoke about the importance of respect in gang culture, where a weak reputation will lead to frequent victimization and the eventual demise of a gang. Conversely, a gang that has achieved "respect" for being violent has a number of advantages. For example, individuals are less likely to speak to the police out of fear of violent retaliation by the gang.

In order to enhance their gang's respect and reputation for violence, rival gang members will physically or verbally challenge one another. These challenges are called "hit ups." They are intentional signs of disrespect, which demand a response. If the insulted gang member does not respond to the "hit up," it is a sign of weakness in gang culture.

A physical hit up can be one gang member bumping into a rival gang member. Examples of verbal hit ups include saying, "What's up? Come on," or "What's up essay [sic]?"

The prosecutor asked Kramer how shooting someone after a hit up would promote or further the Sureno gang. Kramer testified: "When you have these, the commission of these violent crimes, whether it be against somebody who is perceived to be a rival gang member, the status of the gang within the gang culture is enhanced. The violent reputation of the gang within the gang culture itself is enhanced. [¶] This does a couple of things. It instills fear really and intimidated [sic] not only the rival gangs, but the community that exists within that area where crime occurs; the

9

people who frequent the area, customers, residents, things of that nature.... The result of that being they're feared [sic], and ... not likely to cooperate with ... law enforcement. They're not likely to come testify in court. They are not even likely to call the police when they hear shots fired, or that somebody could potentially be the victim of a crime. That is ... what the benefit to the gang is."

<u>Testimony Regarding Defendant's "Elbow Raise"</u>

Kramer was shown the surveillance video from the night of the shooting. Kramer said that given Maciel's clothing, he would look like a Bulldog gang member to a Sureno. He testified that defendant's elbow raise was a physical hit up. He noted that defendant does not challenge Leanos in the video, but instead "goes right to and makes the contact with the one that is in all red."

<u>Defendant's Testimony Regarding Gang Issues</u>

Defendant testified he was not "gang banging" on the night of the shooting. He has had tattoos since he was a teenager that read: "Shelltown," "38," "Tres Ocho," and "SD." He also had a tattoo of three dots. Defendant testified that when he got the tattoos, they showed his commitment to the Shelltown gang. He did not have the tattoos removed because it would be expensive. He got the "Shelltown" tattoo when he was 17 or 18. At the time of trial he was 32.

Defendant acknowledged that he was previously a member of the Shelltown gang. At the previous trial, defendant testified that the shooting had nothing to do with his prior membership in a gang.

Defendant testified that the "elbow raise" depicted in the video was him placing his cigar in his mouth.

Defendant testified regarding Exhibit 77. He testified that he "believe[d]" that the photograph was taken December 5, 2010. Defendant was asked what he was doing with his fingers in the photograph and he replied, "That was an away Chargers game, and we just was — it was just victory; whatever you want to call it."

<u>Amalia Gonzalez</u>

Amalia Gonzalez is defendant's sister. She testified that she was the female depicted in Exhibit 77. She said that she has never been a member of "the Shelltown crew" and has never been a "gang banger."

She testified that defendant moved to Fresno to "be there" for his kids and to "get away from his gang." As far as she knew, defendant had "[n]othing to do with Shelltown" after he left San Diego.

<u>Physical Evidence</u>

When law enforcement searched defendant's apartment, they located San Diego Chargers paraphernalia, including a towel and multiple articles of clothing.

<u>People v. Alcantar</u>, 2013 Cal. App. Unpub. LEXIS 7097, *2-22 (Oct. 1, 2013).

III.   **DISCUSSION**

A.   **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  (Pet.)   In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a).  Accordingly, this Court has jurisdiction over the instant action.

B.   **Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by AEDPA provisions.

Under AEDPA, a person in custody under a judgment of a state court may only be granted a writ of habeas corpus for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

11

1          1.      Contrary to or an Unreasonable Application of Federal Law

2          A state court decision is "contrary to" federal law if it "applies a rule that

3   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

4   that [are] materially indistinguishable from [a Supreme Court case] but reaches a

5   different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

6   405-06). "AEDPA does not require state and federal courts to wait for some nearly

7   identical factual pattern before a legal rule must be applied . . . The statute recognizes . .

8   . that even a general standard may be applied in an unreasonable manner." Panetti v.

9   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The

10  "clearly established Federal law" requirement "does not demand more than a 'principle'

11  or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state

12  decision to be an unreasonable application of clearly established federal law under §

13  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

14  (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-

15  71 (2003). A state court decision will involve an "unreasonable application of" federal

16  law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at

17  409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

18  Court further stresses that "an *unreasonable* application of federal law is different from

19  an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529

20  U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks

21  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

22  correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541

23  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

24  have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

25  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

26  Federal law for a state court to decline to apply a specific legal rule that has not been

27  squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

28  (2009) (quoted by Richter, 131 S. Ct. at 786).

1

## 2.    Review of State Decisions

2    "Where there has been one reasoned state judgment rejecting a federal claim,

3    later unexplained orders upholding that judgment or rejecting the claim rest on the same

4    grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

5    "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

6    (9th Cir. 2006).   Determining whether a state court's decision resulted from an

7    unreasonable legal or factual conclusion, "does not require that there be an opinion from

8    the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.

9    "Where a state court's decision is unaccompanied by an explanation, the habeas

10    petitioner's burden still must be met by showing there was no reasonable basis for the

11    state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does

12    not require a state court to give reasons before its decision can be deemed to have been

13    'adjudicated on the merits.'"  Id.

14    Richter instructs that whether the state court decision is reasoned and explained,

15    or merely a summary denial, the approach to evaluating unreasonableness under §

16    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

17    or theories supported or, as here, could have supported, the state court's decision; then

18    it must ask whether it is possible fairminded jurists could disagree that those arguments

19    or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

20    Thus, "even a strong case for relief does not mean the state court's contrary conclusion

21    was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

22    authority to issue the writ in cases where there is *no possibility* fairminded jurists could

23    disagree that the state court's decision conflicts with this Court's precedents."  Id.

24    (emphasis added).  To put it yet another way:

25          As a condition for obtaining habeas corpus relief from a federal
          court, a state prisoner must show that the state court's ruling on the claim
26          being presented in federal court was so lacking in justification that there
          was an error well understood and comprehended in existing law beyond
27          any possibility for fairminded disagreement.

28    Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

13

are the principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).

## IV.   REVIEW OF PETITION

### A.   Claim One: Insufficient Evidence to Support Gang Enhancement

Petitioner, in his first claim for relief, asserts that there was insufficient evidence to support his enhancement for committing the murder for the benefit of a criminal street gang. (Pet. at 4.)

### 1.   State Court Decision

The claim was denied in a reasoned decision by the Court of Appeal (Lodged Doc. 4.) and in a subsequent petition for review filed with California Supreme Court (Lodged Doc. 6.) "[W]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption. Id. at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on this issue, this Court "looks through" the

California Supreme Court decision to the reasoned analysis of the Court of Appeal. In the last reasoned decision denying Petitioner's claim, the appellate court explained:

ANALYSIS

I. THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S TRUE FINDING ON THE SECTION 186.22, SUBDIVISION (b)(1) ENHANCEMENT

Defendant contends that there was insufficient evidence to support the jury's true finding regarding the section 186.22, subdivision (b)(1) enhancement. We disagree.

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence ... such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.]" (People v. Clark (2011) 52 Cal.4th 856, 942.) Evidence is "substantial" when it is reasonable, credible and of solid value. (Ibid.) Substantial evidence may include circumstantial evidence and any reasonable inferences drawn therefrom. (Id. at p. 943.)

Section 186.22, subdivision (b)(1) applies to individuals who commit a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) In other words, it applies to "when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (People v. Albillar (2010) 51 Cal.4th 47, 68 (Albillar).)

Thus, the provision has two prongs. The first prong is that defendant is convicted of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang." (Albillar, supra, 51 Cal.4th at p. 67.) The second prong is a scienter requirement that the defendant committed the gang-related felony "'with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (Id. at p. 64.)

A. SUBSTANTIAL EVIDENCE SUPPORTED THE FIRST PRONG OF THE GANG ENHANCEMENT

Defendant relies on a number of cases for essentially the same proposition: that the elements of section 186.22, subdivision (b)(1) are not satisfied merely by evidence that a gang member committed a felony.[fn11] (See People v. Olguin (1994) 31 Cal.App.4th 1355 (Olguin); People v. Ochoa (2009) 179 Cal.App.4th 650 (Ochoa); People v. Albarran (2007) 149 Cal.App.4th 214 (Albarran); and People v. Ramon (2009) 175 Cal.App.4th 843 (Ramon).) In other words, not all crimes committed by gang members are necessarily gang-related for purposes of subdivision (b)(1).

FN11: See appellant's opening brief at page 19 [arguing that Olguin

recognized as "plausible" the argument that a gang member's crime was committed for personal rather than gang-related reasons]; id. at p. 23 [arguing that Albarran court "concluded that despite the evidence that the defendant was a gang member, the motive for the underlying crimes 'was not apparent from the circumstances of the crime.'"; id. at p. 24 [arguing that Ochoa reached same result as Albarran that gang membership alone could not sustain inference that crime was gang related despite expert witness's testimony to the contrary]; id. at pp. 24-25 [arguing that Ramon court held "the mere fact that the individuals involved in the crime were gang members did not suffice to prove their criminal acts were carried out in order to promote their gang"].

It is true that a "gang enhancement cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes." (Ochoa, supra, 179 Cal.App.4th at p. 663.) But the jury's verdict here was supported by more. Not only was there evidence that defendant became a member of a gang and thereafter committed a crime, there was also evidence that the specific crime was gang-related.

At trial, the parties offered two competing theories as to the purpose of defendant's "elbow raise" near the time he passed Maciel in the store. Defendant contended that he was merely placing his cigar into his mouth. Conversely, the prosecution offered their expert's testimony that the "elbow raise" was in fact a "hit up" (i.e., gang challenge) directed to Maciel. The prosecution's suggested inference is reasonable, as we explain post.

In the surveillance video, Leanos does not appear to be wearing any red or any depictions of bulldogs. There appears to be no physical interaction between defendant and Leanos as they pass each other. It is only when defendant passes Maciel that physical interaction occurs.[fn12] Defendant raised his elbow while passing Maciel, who was wearing red outerwear, a black shirt depicting a bulldog, and a California State University — Fresno[fn13] hat. This evidence gives rise to the inference defendant perceived Maciel to be a member of a rival gang.[fn14]

**FN12**: As Kramer testified, defendant does not challenge Leanos in the video, but instead "goes right to and makes the contact with the one that is in all red [Maciel]."

**FN13**: Fresno State's mascot is a bulldog.

**FN14** Defendant argues that "[a]lthough Kramer testified that to a Sureno, Maciel would appear to be a Bulldog gang member, Maciel's apparel was equally consistent with being a fan ...." But simply raising alternative, innocuous explanations of the evidence is not enough to warrant reversal. (See People v. Lopez (2013) 56 Cal.4th 1028, 1072.) "Under the substantial evidence rule ... ' "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (Ibid.)

Moreover, this contention ignores the fact Maciel's clothing was not the only evidence that defendant perceived Maciel to be a gang member. Defendant passed Leanos, apparently without incident, seconds before raising his elbow near Maciel. And, defendant did not kill Leanos.

The evidence showed defendant was, at least at one point in his life, a member of the Shelltown gang, a subset of the Sureno gang. There was also evidence the Surenos and Bulldogs are rival gangs. Viewed together, this evidence gives rise to the inference defendant perceived Maciel to be a rival gang member and intentionally "hit" him "up."

When the inference supporting the judgment is reasonable, any contrary inferences are irrelevant.[fn15] (See People v. Kraft (2000) 23 Cal.4th 978, 1058.) Moreover, the jury could have even accepted both sides' proposed inferences, and concluded that defendant's elbow raise was both a "hit up" and a manner of placing the cigar in his mouth.

**FN15**: Defendant testified that he was placing a cigar into his mouth. Additionally, one of the surveillance videos depicts him placing the cigar into his mouth near the time he passes Maciel.

Regardless, we draw whichever inference supports the judgment on appeal. (See People v. Whalen (2013) 56 Cal.4th 1, 56, fn. 22.) Here, the judgment-supporting inference is that defendant intentionally raised his elbow in an act of hostility towards someone displaying a rival gang's color (red) and symbol (bulldog). We presume that inference is correct and that defendant did "hit up" Maciel in the seconds before the shooting. (See People v. Brady (2010) 50 Cal.4th 547, 564 [on review, "we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence"].)

Given that there was crime-specific evidence of gang-relatedness, Detective Kramer permissibly offered his opinion that a similarly-described hypothetical crime would be gang-related. (See People v. Xue Vang (2011) 52 Cal.4th 1038, 1052 ["[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related. Indeed, it is settled that an expert may express such an opinion."].)

On this topic, Detective Kramer testified that a post "hit up" shooting benefits the shooter's gang. He testified that, "[w]hen you have ... the commission of these violent crimes, whether it be against somebody who is perceived to be a rival gang member, the ... violent reputation of the gang ... is enhanced." This testimony was sufficient. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[] criminal street gang' within the meaning of section 186.22(b)(1)." (Albillar, supra, 51 Cal.4th at p. 63. See also People v. Xue Vang, supra, 52 Cal.4th at p. 1048.)

B. SUBSTANTIAL EVIDENCE SUPPORTED THE SECOND PRONG OF THE GANG ENHANCEMENT

Kramer's Opinion

Defendant argues Kramer's opinion that he "specifically intended to promote Surenos" lacks evidentiary support. This characterization of Kramer's opinion is inaccurate. Kramer testified as to how, hypothetically, [fn16] a post-"hit up" shooting would benefit the shooter's gang. We see no indication in the record that Kramer directly testified as to defendant's intent.

**FN16**: A gang expert's testimony on this issue is frequently (and appropriately) offered with respect to a "hypothetical" crime with similar facts to the charged crime. (<u>People v. Xue Vang</u>, supra, 52 Cal.4th at pp. 1045, 1047-1048; <u>In re Frank S.</u> (2006) 141 Cal.App.4th 1192, 1197. <u>See</u>, <u>e.g.</u>, <u>Albillar</u>, supra, 51 Cal.4th at p. 63; <u>People v. Morales</u> (2003) 112 Cal.App.4th 1176, 1197. <u>Cf.</u> <u>People v. Gonzalez</u> (2006) 38 Cal.4th 932, 946 ["'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." '"])

Rather, Kramer offered an explanation of defendant's "elbow raise" based on his knowledge regarding gang culture and habits. And, contrary to defendant's apparent contention on appeal,[fn17] Detective Kramer was entitled to offer that explanation. (<u>In re Frank S.</u>, supra, 141 Cal.App.4th at p. 1196 [expert may testify to gang culture and habits].) "It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation." (<u>Ibid.</u>) "'It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes "respect."'" (<u>People v. Gonzalez</u>, supra, 38 Cal.4th at p. 945.)

**FN17**: Defendant cites <u>Ochoa</u>'s description of the relevant expert testimony in that case as doing "'"nothing more than [improperly] inform[ing] the jury how [the expert] believed the case should be decided,." '" (<u>See</u> <u>Ochoa</u>, supra, 179 Cal.App.4th at p. 662.)

There is an important difference between an expert's testimony that "a specific individual possessed a specific intent," and testimony that "give[s] meaning to the defendant's actions." (<u>In re Frank S.</u>, supra, 141 Cal.App.4th 1192, 1197-1198. <u>Cf.</u> <u>People v. Xue Vang</u>, supra, 52 Cal.4th at pp. 1045-1051.) Here, Detective Kramer offered one plausible explanation of defendant's elbow raise (i.e., that it was a gang "hit up"). He did not baldly assert that defendant had a particular intent.

Substantial Evidence of Intent

As we will explain, Kramer's testimony gave meaning to defendant's conduct and, in conjunction with the evidence of defendant's conduct itself, was sufficient to support the intent requirement of the gang enhancement statute.

"'[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred.'" (<u>People v. Edwards</u> (1992) 8 Cal.App.4th 1092, 1099.)" '[W]e routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.'" (<u>People v. Miranda</u> (2011) 192 Cal.App.4th 398, 411-412.) That is why we have recognized that "[p]roof of intent may be made by way of inferences from a defendant's volitional acts which are done with knowledge of the probable consequences ...." (<u>People v. Pitts</u> (1990) 223 Cal.App.3d 606, 892-893.)

Detective Kramer's testimony went to the "predictable results" and

18

"probable consequences" of hitting up a rival gang member and then shooting them. The result is the gang's reputation for violence is elevated which enhances the gang's ability to commit future crimes.

There was also evidence that defendant acted with knowledge of those probable consequences. "Knowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (People v. Buckley (1986) 183 Cal.App.3d 489, 494-495.) Here, the evidence that defendant was, at a minimum, a former gang member gives rise to a reasonable inference that defendant was familiar with gang culture and knew of the probable consequences of a "successful" hit up.[fn18] Thus, "although no direct evidence showed defendant acted with the required knowledge ... there was substantial evidence from which a rational trier of fact could have found he in fact possessed such a mental state." (People v. Hill (1998) 17 Cal.4th 800, 851, overruled on other grounds by Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13.)

**FN18**: Detective Kramer testified that this type of interaction between rival gang members occurs "quite often."

In sum, there is substantial evidence supporting all of the following: (1) defendant intentionally "hit up" Maciel; (2) that a "successful" hit up enhances a gang's reputation for violence and ability to commit future crimes; and (3) defendant was, at a minimum, a prior gang member, which gives rise to the inference that he knew the benefits of a "successful" hit up to a gang. This was sufficient because, as we noted earlier, a "defendant's intentional acts, when combined with his knowledge that those acts would assist crimes by fellow gang members, afford[s] sufficient evidence of the ... specific intent" required by section 186.22, subdivision (b)(1). (People v. Morales, supra, 112 Cal.App.4th at p. 1198-1199.)

People v. Alcantar, 2013 Cal. App. Unpub. LEXIS 7097 at 22-34.

2.   Legal Standards

a.   Sufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); accord Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. See Herrera v. Collins, 506 U.S. 390, 401-02, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). But the prisoner faces a "heavy burden" to prevail on such a claim. See Juan H., 408 F.3d at 1274, 1275 n.13. Under Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.

19

1  2781, 61 L. Ed. 2d 560 (1979) (italics in original), the question is whether "*any* rational

2  trier of fact could have found the essential elements of the crime beyond a reasonable

3  doubt."

4  When determining the sufficiency of the evidence, a reviewing court makes no

5  determination of the facts in the ordinary sense of resolving factual disputes. See

6  Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007). Rather, the reviewing court "must

7  respect the province of the jury to determine the credibility of witnesses, resolve

8  evidentiary conflicts, and draw reasonable inferences from proven facts by assuming

9  that the jury resolved all conflicts in a manner that supports the verdict." See Walters v.

10  Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); see also Jackson, 443 U.S. at 319, 324,

11  326. Thus, in determining the sufficiency of the evidence, "the assessment of the

12  credibility of witnesses is generally beyond the scope of review." See Schlup v. Delo,

13  513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); see also United States v.

14  Lindsey, 634 F.3d 541, 552 (9th Cir. 2011); Bruce v. Terhune, 376 F.3d 950, 957 (9th

15  Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference

16  under Jackson.").

17  While "'mere suspicion or speculation cannot be the basis for the creation of

18  logical inferences,'" see Maass, 45 F.3d at 1358 (citation omitted), "'[c]ircumstantial

19  evidence can be used to prove any fact, including facts from which another fact is to be

20  inferred, and is not to be distinguished from testimonial evidence insofar as the jury's

21  fact-finding function is concerned,'" Payne v. Borg, 982 F.2d 335, 339 (9th Cir. 1992)

22  (citation omitted). Furthermore, "to establish sufficient evidence, the prosecution need

23  not affirmatively 'rule out every hypothesis except that of guilt.'" Schell v. Witek, 218 F.3d

24  1017, 1023 (9th Cir. 2000) (quoting Wright v. West, 505 U.S. 277, 296, 112 S. Ct. 2482,

25  120 L. Ed. 2d 225 (1992)).

26  A state court's resolution of an insufficiency of the evidence claim is evaluated

27  under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2). See Emery v. Clark, 643 F.3d 1210,

28  1213-14 (9th Cir. 2011) ("When we undertake collateral review of a state court decision

20

rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1), . . . we ask only whether the state court's decision was contrary to or reflected an unreasonable application of <u>Jackson</u> to the facts of a particular case."); <u>see also</u> <u>Long v. Johnson</u>, 736 F.3d 891, 896 (9th Cir. 2013) ("The pivotal question, then, is whether the California Court of Appeal . . . unreasonably applied <u>Jackson</u> in affirming Petitioner's conviction for second-degree murder."); <u>Boyer v. Belleque</u>, 659 F.3d 957, 965 (9th Cir. 2011). ("[T]he state court's application of the <u>Jackson</u> standard must be 'objectively unreasonable' to warrant habeas relief for a state court prisoner."); <u>Juan H.</u>, 408 F.3d at 1275 ("[W]e must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' <u>Jackson</u> and <u>Winship</u> to the facts of this case.") (citing 28 U.S.C. § 2254(d)(1)).

Finally, in adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction]." <u>See</u> <u>Juan H.</u>, 408 F.3d at 1278 n.14 (citing <u>Jackson</u>, 443 U.S. at 324 n.16); <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004) (<i>en banc</i>) ("The <u>Jackson</u> standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.") (internal quotation marks omitted).

> b. California Law Regarding Criminal Street Gang Enhancement

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members ...." Cal. Penal Code § 186.22(b)(1).) "Not every crime committed by gang members is related to a gang." <u>People v. Albillar</u>, 51 Cal.4th 47, 60, 119 Cal. Rptr. 3d 415, 244 P.3d 1062 (2005). Even "when two or more gang members commit a crime together, they may be on a frolic and detour unrelated to the gang." <u>Emery v. Clark</u>, 643 F.3d 1210, 1214 (9th Cir. 2011)

1   (citing <u>Albillar</u>, 244 P.3d at 1072.)

2       The specific intent element of § 186.22(b)(1) does not "require[ ] that the

3 defendant act with the specific intent to promote, further, or assist a gang; the statute

4 requires only the specific intent to promote, further, or assist criminal conduct by gang

5 members." <u>Albillar</u>, 51 Cal.4th at 67. This element "applies to any criminal conduct,

6 without a further requirement that the conduct be apart from the criminal conduct

7 underlying the offense of conviction sought to be enhanced." <u>Id.</u> at 66; <u>see</u> <u>Emery v.</u>

8 <u>Clark</u>, 643 F.3d at 1215 (recognizing that <u>Albillar</u> "definitively interpreted § 186.22(b)(1),"

9 "overruled" the Ninth Circuit's interpretation of the statute, and that federal courts are

10 bound by the California Supreme Court's interpretation).

11       Evidence that a crime would enhance a gang's status or reputation or that it would

12 intimidate rival gangs or potential witnesses within the gang's territory, has been found to

13 be sufficient to support a finding that the crime was "for the benefit of" the gang. <u>See,</u>

14 <u>e.g.</u>, <u>People v. Garcia</u>, 153 Cal.App.4th 1499, 1503-06, 64 Cal. Rptr. 3d 104 (2007).

15               3.   <u>Analysis</u>

16       Petitioner presents two arguments as to why there was insufficient evidence to

17 prove the enhancement. First, he contends that there was insufficient evidence that he

18 was affiliated with a criminal street gang at the time of the offense. (Pet. at 4.) As

19 described by the California Court of Appeal, there was significant evidence presented at

20 trial that Petitioner was, at least at some point, a member of the Shelltown 38 gang, a

21 subset of the Sureno gang. Petitioner had previously identified himself as a member of

22 the Sureno gang to police officers over six times between the period between 2000 to

23 2011, and he had a "38" tattooed on his finger, which the gang expert opined stood for

24 the Shelltown 38 Street gang. He had associated with other members known to be in the

25 gang, and was arrested for vandalism for spray painting a building with "Shelltown 38."

26 There was ample evidence showing that Petitioner was a gang member. To the extent

27 that Petitioner argues that he was no longer affiliated with a criminal street gang, or that

28 evidence that he was associated with a gang at the time of the murder was based only

1    on speculation is without merit.

2          As described, Petitioner had admitted to gang membership to the police six times

3    between 2000 and 2011. The crime of conviction was committed in May 2011, less than

4    a year after Petitioner last admitted gang affiliation. Petitioner did not present any

5    intervening evidence that he had left or disassociated from the gang. The inference that

6    Petitioner was still a member or associated with the gang was based on significant

7    evidence and not on mere speculation alone. Viewing the evidence underlying

8    Petitioner's gang affiliation in a light most favorable to the prosecution, it was a

9    reasonable inference that Petitioner was still a gang member at the time the incident

10   occurred, and Petitioner's first argument is without merit.

11         Petitioner's second dispute is that there was not sufficient evidence to show that

12   the crime was committed with the intent to benefit the criminal street gang. Petitioner

13   argues that the only evidence that Petitioner "hit up" the victim was based on the

14   testimony of the gang expert, and that Petitioner, as a former gang member, had no

15   motive to "hit up" the victim or shoot him for the benefit of his former gang.

16         The California Court of Appeal found, based on the gang expert's hypothetical,

17   the plausible explanation of the elbow raise was a "hit up" and a challenge to a rival

18   gang. The Court further found that the gang expert's testimony gave meaning to

19   Petitioner's conduct, and, along with evidence of the actual conduct of Petitioner, there

20   was sufficient evidence to show that the conduct in question was committed with the

21   intent to benefit the gang.

22         After explaining that intent is usually difficult to prove based on direct evidence

23   alone, the state court looked at Petitioner's actions with the knowledge of the probable

24   consequences of the actions to create inferences establishing the proof of intent.  The

25   Court found that the expert's testimony provided evidence that the predictable results

26   and probable consequences of "hitting up" a rival gang member and then shooting them

27   is that the gang's reputation for violence would be elevated enhancing the ability of the

28   gang to commit further crimes. As Petitioner had been a gang member for a long time

1   period, the expert opined that it was likely that Petitioner would have knowledge of the

2   probable consequences of a gang "hit up."

3       The gang expert's testimony provided sufficient evidence to support the

4   conviction. "[T]o prove the elements of the criminal street gang enhancement, the

5   prosecution may ... present expert testimony on criminal street gangs." People v.

6   Hernandez, 33 Cal.4th 1040, 1047-48, 16 Cal. Rptr. 3d 880, 94 P.3d 1080 (2004).

7   Accordingly, there was sufficient evidence to support inferences that Petitioner, with a

8   long history of gang involvement intentionally "hit up" the victim, that he knew that a

9   successful hit up benefitted the gang's reputation for violence and to commit further

10  crimes, and therefore had the specific intent to promote, further, or assist in the gang's

11  criminal conduct.

12      Under Jackson and AEDPA, the state decision is entitled to double deference on

13  habeas review. There was sufficient evidence in the trial record, direct evidence and

14  evidence from the gang expert, to deny Petitioner's challenge to the finding that the

15  crime was committed in furtherance of the criminal street gang. There was no

16  constitutional error, and Petitioner is not entitled to relief with regard to this claim.

17          **B.    Claim Two: Denial of Motion to Bifurcate Gang Enhancement**

18      Petitioner, in his second claim for relief, asserts that his due process rights were

19  violated by the trial court's denial of the motion to bifurcate the gang enhancement from

20  the prosecution of Petitioner's substantive offenses. (Pet. at 4.)

21              1.    State Court Decision

22      The claim was denied in a reasoned decision by the Court of Appeal (Lodged

23  Doc. 4.) and in a subsequent petition for review filed with California Supreme Court

24  (Lodged Doc. 6.) Since the Court of Appeal was the last court to issue a reasoned

25  opinion on this issue, this Court "looks through" the California Supreme Court decision to

26  the reasoned analysis of the Court of Appeal. See Ylst v. Nunnemaker, 501 U.S. at 803-

27  04. In the last reasoned decision denying Petitioner's claim, the appellate court

28  explained:

**THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO BIFURCATE**

Defendant contends that the trial court's denial of his motion to bifurcate the gang enhancement from the substantive offense was erroneous and prejudicial. We disagree.

A trial court's bifurcation ruling is reviewed for abuse of discretion. (See People v. Hernandez (2004) 33 Cal.4th 1040, 1048.) A trial court's discretion to deny bifurcation of a gang enhancement is broader than its discretion to admit gang evidence when no gang enhancement is charged. (Id. at p. 1050.)

Defendant argues that "the prosecut[ion's] entire theory was centered on the fact this was a gang offense motivated by gang rivalry that benefitted the Surenos and relied on gang evidence and expert opinion to do so." There is nothing wrong with what defendant describes.

There are multiple ways gang evidence is used at trial. Some uses are appropriate and others are not. For example, it is improper to introduce gang evidence to establish "the defendant has a criminal disposition and is therefore guilty of the offense charged." (People v. Williams (1997) 17 Cal.4th 148, 193.) But, it is not improper to introduce gang evidence to establish a defendant's motive. Even in cases where no gang enhancement is charged, "[e]vidence of the defendant's gang affiliation ... can help prove ... motive ... specific intent ... or other issues pertinent to guilt of the charged crime." (People v. Hernandez, supra, 33 Cal.4th at p. 1049.) "[I]n a gang-related case, gang evidence is admissible if relevant to motive ... so long as its probative value is not outweighed by its prejudicial effect." (People v. Williams, supra, 17 Cal.4th at p. 193. See also People v. Funes (1994) 23 Cal.App.4th 1506, 1518.) Here, the gang evidence was used in a permissible manner: to establish motive and intent.

Defendant claimed he acted in self-defense when he shot Maciel. The gang evidence contradicted this theory. If defendant believed Maciel was a rival gang member and "hit" him "up" seconds before the shooting, the theory of self-defense becomes far less plausible. The prosecution was entitled to make this argument and present evidence supporting it. It was not inadmissible evidence of a defendant's criminal disposition, (see Evid. Code § 1101), but rather evidence of motive and intent.

As noted above, there was also evidence introduced regarding "predicate offenses" of the Surenos and Shelltown gangs. There is no question that this evidence was relevant to the gang enhancement. (See § 186.22, subd. (e).) However, as defendant points out, there was no evidence that he was involved in the predicate offenses identified by the gang experts. Thus, the predicate offense evidence had little probative value, if any, with respect to the second degree murder charge. But, defendant's noninvolvement in the predicate offenses also reduces the likelihood of undue prejudice. The evidence does not directly implicate prior criminal activity by defendant, and is therefore less likely to facilitate improper "criminal propensity" reasoning by the jury.

Ultimately, the question of whether the predicate offense evidence

would have been admissible in the absence of the gang enhancement is not dispositive. "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself — for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged — a court may still deny bifurcation." (People v. Hernandez, supra, 33 Cal.4th at p. 1050.) Here, the predicate offense evidence was not particularly inflammatory.[fn19] Moreover, it was not evidence "of offenses for which a defendant might have escaped punishment." (Id. at p. 1051.) To the contrary, there was no evidence defendant was implicated in the predicate offenses at all.

FN19: Detective Kramer's testimony regarding prior offenses by Sureno gang members was essentially limited to the name of the offender, type of offense (e.g., "assault with a deadly weapon"), applicable statute, and date of offense. Detective Kramer did not testify to any inflammatory details of the crimes.

Additionally, the court instructed the jury on the limited purposes for which the gang evidence could be considered. The court stated, "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove malice aforethought and/or the gang-related enhancement charged." "[W]e presume the jury faithfully followed the court's limiting instruction." (People v. Ervine (2009) 47 Cal.4th 745, 776.)

"Even if some of the expert testimony would not have been admitted at a trial limited to guilt, the countervailing considerations that apply when the enhancement is charged permitted a unitary trial." (People v. Hernandez, supra, 33 Cal.4th at p. 1051.)

People v. Alcantar, 2013 Cal. App. Unpub. LEXIS 7097 at 34-38.

2.    Analysis

The United States Supreme Court has not determined that a criminal defendant has a federal constitutional right to bifurcation. See Spencer v. Texas, 385 U.S. 554, 565-66, 87 S. Ct. 648, 17 L. Ed. 2d 606 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); Marshall v. Lonberger, 459 U.S. 422, 438 n.6, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) (reaffirming Spencer). Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. Zafiro v. United States, 506 U.S. 534, 538-39, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

1  making a reliable judgment about guilt or innocence"); <u>Featherstone v. Estelle</u>, 948 F.2d

2  1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense must

3  actually render petitioner's state trial fundamentally unfair and hence, violative of due

4  process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal

5  quotation marks and citation omitted).

6      Petitioner bears the burden of proving that he is entitled to federal habeas relief,

7  <u>Davis v. Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2003), and must establish that prejudice

8  arising from the failure to grant a severance was so "clear, manifest, and undue" that he

9  was denied a fair trial. <u>Lambright v. Stewart</u>, 191 F.3d 1181, 1185 (9th Cir. 1999)

10  (quoting <u>United States v. Throckmorton</u>, 87 F.3d 1069, 1071-72 (9th Cir. 1996)). "In

11  evaluating prejudice, the [federal habeas court] focuses particularly on cross-

12  admissibility of evidence and the danger of 'spillover' from one charge to another,

13  especially where one charge or set of charges is weaker than another." <u>Davis</u>, 384 F.3d

14  at 638. Undue prejudice also exists "whenever joinder of counts allows evidence of other

15  crimes to be introduced in a trial where the evidence would otherwise be inadmissible."

16  <u>Sandoval v. Calderon</u>, 241 F.3d 765, 772 (9th Cir. 2000).

17      On habeas review, federal courts neither depend on the state law governing

18  severance, <u>Grisby</u>, 130 F.3d at 370 (citing <u>Hollins v. Dep't of Corrections, State of Iowa</u>,

19  969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance given

20  to criminal defendants in the federal criminal justice system. <u>Id.</u> Rather, the relevant

21  question is whether the state proceedings satisfied due process. <u>Id.</u>; <u>see also</u> <u>Cooper v.</u>

22  <u>McGrath</u>, 314 F. Supp. 2d 967, 983 (N.D. Cal. 2004).[1]

23      As the California Court of Appeal correctly observed, this case involved a

24  Petitioner that committed crimes that were motivated by Petitioner's participation in a

25  criminal street gang. The evidence produced at trial regarding the gang enhancement

26

27  ———————————
   [1] To the extent petitioner is arguing that the trial court abused its discretion under state law in denying his request for bifurcation, his claim is not cognizable in these federal habeas proceedings. <u>Estelle</u>, 502 U.S. at 67-68.

28

1  was admissible and relevant to the other charged crimes. Specifically, the theory

2  presented by the prosecution was that Petitioner physically "hit up" the victim to

3  challenge a perceived rival gang member. While evidence of predicate offenses of the

4  gang were presented, no evidence was presented that Petitioner was involved in any of

5  the predicate offenses, and therefore did not implicate prior criminal conduct by

6  Petitioner which reduced the likelihood of undue prejudice. Finally, the court instructed

7  the jury that it "may consider evidence of gang activity only for the limited purpose of

8  deciding whether the defendant acted with the intent, purpose and knowledge that are

9  required to prove malice aforethought and/or the gang-related enhancement charged."

10  (Lodged Doc. 4 at 24.)

11      The above factors mitigated the possibility of prejudice to Petitioner. Under the

12  circumstances of this case, Petitioner has not established that the state trial court's

13  refusal to bifurcate the gang enhancement charges at trial rendered his trial

14  fundamentally unfair. Davis, 384 F.3d at 638.

15      Petitioner fails to demonstrate that the state court rejection of his claim "resulted

16  in a decision that was contrary to, or involved an unreasonable application of, clearly

17  established Federal law, as determined by the Supreme Court of the United States." 28

18  U.S.C. § 2254(d). Federal habeas relief is not warranted on this claim.

19

20  **IV.    RECOMMENDATION**

21      Accordingly, it is hereby recommended that the petition for a writ of habeas

22  corpus be DENIED with prejudice.

23      This Findings and Recommendation is submitted to the assigned District Judge,

24  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after

25  being served with the Findings and Recommendation, any party may file written

26  objections with the Court and serve a copy on all parties.  Such a document should be

27  captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply

28  to the objections shall be served and filed within fourteen (14) days after service of the

objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   May 25, 2016                              /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE